IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RYAN KNOWLES, b/n/f | § | |
| FRED KNOWLES, | § | |
| | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | |
| ADELAIDE HORN, in her official | § | 3:08-CV-1492-K |
| capacity as COMMISSIONER, TEXAS | § | |
| DEPARTMENT OF AGING AND | § | |
| DISABILITY SERVICES, and ALBERT | § | |
| HAWKINS, in his official capacity as | § | |
| EXECUTIVE COMMISSIONER, TEXAS | § | |
| HEALTH AND HUMAN SERVICES | § | |
| COMMISSION, | § | |
| | § | |
|     Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

_____Before the Court are: (1) Plaintiff Ryan Knowles, by his next friend and guardian,

Fred Knowles's Motion for Summary Judgment (Doc. No. 24), filed on September 14,

2009; (2) Plaintiff's Motion to Strike Expert Report of Fred Bibus, M.D., and Lilani

Muthali, M.D. (Doc. No. 27) filed on September 14, 2009; (3) Defendants' Motion for

Take Nothing Judgment (Doc. No. 28), filed on September 14, 2009; (4) Defendants'

*Daubert* Challenge to Plaintiff's Expert, Dr. Cynthia Peacock (Doc. No. 29), filed on

September 14, 2009; and (5) Plaintiff's Motion to Strike Affidavit of Fred Bibus, M.D.

(Doc. No. 36), filed on October 5, 2009.  The Court: (1) **GRANTS** Plaintiffs' Motion

- 1 -

for Summary Judgment and **DENIES** all other outstanding motions.

I.     **Factual and Procedural Background**

Plaintiff Ryan Knowles ("Knowles") is a twenty-six-year-old man with severe and life-threatening disabilities, including: cerebral palsy, spastic quadriplegia, profound mental retardation, lung disease, a seizure disorder, and a history of aspiration pneumonia.  Fred Knowles, the father of Ryan Knowles, is his next friend and guardian.

Defendant Adelaide Horn is the commissioner of the Texas Department of Aging and Disability Services ("DADS").  Defendant Albert Hawkins is the executive commissioner of the Texas Health and Human Services Commission ("HHSC").  They are named as Defendants here in their official capacities pursuant to *Ex parte Young*, 209 U.S. 123 (1908).

Each state participating in the joint federal- and state-funded Medicaid program must submit a plan to the Secretary of the U.S. Department of Health and Human Services for approval.  Texas has designated HHSC to administer and supervise the state's Medicaid plan.  Pursuant to an HHSC delegation of authority, DADS operates a federally approved home- and community-based waiver program for Texas residents with mental retardation who would otherwise be institutionalized.

Knowles receives continuous monitoring and care at his home in Heath, Texas.  Without round-the-clock care, Knowles likely would die.  DADS and HHSC have provided home healthcare services to Knowles since his birth.

The Texas Legislature added Rider 45 to DADS' 2008-2009 legislative appropriation, expanding funding to minimize institutionalization. Rider 45 raised the individual cost limits for most DADS waiver programs to 200 percent of the reimbursement rate for institutional care. General Appropriations Act, 80th Leg., R.S., ch. 1428, art. II-14. Rider 45 also provided that DADS may use general revenue funds in certain cases when (1) the cost of serving an individual in one of the waivers listed in Rider 45 exceeds the individual cost limit for that waiver, (2) federal financial participation is not available to pay for such services, and (3) there is "no other available living arrangement in which the person's health and safety can be protected" based on an assessment by DADS' clinical staff.

Despite the increase provided by Rider 45, the cost of Plaintiff's annual plan of care exceeds his individual cost limit as determined by the state of Texas. A "fair hearing," described by the Texas Administrative Code as "an informal, orderly, and readily available proceeding held before an impartial DHS representative," was held in August 2007. DADS has refused to conduct a subsequent hearing after the effective date of Rider 45 on September 1, 2007.

Following a review, DADS staff concluded that Plaintiff's medical needs could be met in an institutional setting and decided to terminate his in-home care as of August 29, 2008. Among the facilities offered to the Knowles family was the Denton State School in Denton, Texas. There, the nurse to patient ratio is—at best—one to six;

- 3 -

however, that ratio would likely be closer to one to twenty-five.  DADS' own website assigned Denton State School a low rating of 20 out of 100.  (Pl.'s Br. 12; Pl.'s App. 232).  Also, the Denton State School was cited in an evaluation published on DADS' own website for failure, among other things "to educate direct care staff on basic first aid, health, and emergency needs," "to provide clients' health care services, prompt treatment, preventative services, and follow-up care," "to secure nursing services for the clients as needed," and "to ensure that drugs were administered in compliance with the physician's orders."  (Pl.'s Br. 12; Pl.'s App. 233–35).

Plaintiff's treating physicians and designated expert witness, Dr. Cynthia L. Peacock have unanimously stated that he will die if institutionalized and assert that his health and safety cannot be adequately protected in a state school setting.  Further, the director of nursing at the private nursing facility to which Knowles was referred by the state for possible placement asserted that it "would be fatal" for him to be placed in such a facility.  (Pl.'s Br. 10; Pl.'s App. 48–49).

Plaintiff alleges the Defendants' actions constitute impermissible discrimination under the Americans with Disabilities Act ("ADA"), violate Section 504 of the Rehabilitation Act of 1973, contravene other federal and state laws, and violate his due process rights.

This Court entered a temporary restraining order ("TRO") on August 29, 2008, enjoining Defendants and their officers, agents, servants, employees, and attorneys, and

any and all persons in active concert or participation with them from terminating nursing services to Plaintiff Ryan Knowles.  On January 26, 2009, this Court extended the TRO into a preliminary injunction against Defendants.

This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction).

Plaintiff moves for a permanent injunction.

## II.    Legal Standard

Summary judgment is appropriate when the pleadings, affidavits, and other summary judgment evidence show that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *U.S. Philips Corp. v. Iwasaki Elec. Co.*, 505 F.3d 1371, 1374 (Fed. Cir. 2007).  The moving party bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 322–25.  Once a movant makes a properly supported motion, the burden shifts to the nonmovant to show that summary judgment should not be granted; the nonmovant may not rest upon the allegations in the pleadings, but must support the response to the motion with summary judgment evidence showing the existence of a genuine fact issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–57 (1986).

In considering whether genuine issues of material fact exist, the court must

determine whether a reasonable jury could return a verdict for the nonmoving party in the face of all evidence presented. *Id.* at 249. All evidence and reasonable inferences must be viewed in the light most favorable to the nonmovant. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

## III.   Analysis

The standard for a permanent injunction is "essentially the same" as for a preliminary injunction, in that the plaintiffs must show (1) the existence of a substantial threat of irreparable harm that outweighs any harm the relief would accord to the defendants, (2) that there is no adequate remedy at law, and (3) that granting the injunction will not disserve the public interest. *See ITT Educ. Servs., Inc. v. Arce*, 533 F.3d 342, 347 (5th Cir. 2008); *Calmes v. United States*, 926 F. Supp. 582, 591 (N.D. Tex. 1996); *see also Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 546 n.12 (1987). To justify a permanent injunction, however, the plaintiffs must demonstrate actual success on the merits, rather than a likelihood of success. *Calmes*, 926 F. Supp. at 591–92 (citing *Amoco Prod. Co.*, 480 U.S. at 546 n.12.

### A.   Success on the Merits

Plaintiff asserts that Defendants' actions do not comport with the ADA, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), and the Texas Persons with Mental Retardation Act, Tex. Health & Safety Code § 591.001, *et seq.* He further claims that he has not been granted due process through a fair hearing after the effective date

- 6 -

of Rider 45.

### 1.    ADA and Rehabilitation Act Claims

A "qualified individual" for ADA purposes is a disabled person who "meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131. This includes a person who has had severe, long-term disabilities, is Medicaid-eligible, and at risk of being placed in a medical institution. *Grooms v. Maram*, 563 F. Supp. 2d 840, 850 (N.D. Ill. 2008) (citing *Radaszewski v. Maram*, 383 F.3d 599, 612 (7th Cir. 2004)). Other factors to determine whether someone is a "qualified individual" and therefore eligible for a home- and community-based Medicaid waiver program include whether home care is appropriate and beneficial and whether the cost of home care would exceed the anticipated cost of caring for the person in an institutional setting. *Id.* Because of similarities between the relevant provisions of the ADA and the Rehabilitation Act and their implementing regulations, courts construe and apply them in a consistent manner. *Radaszewski*, 383 F.3d at 607; *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1179 n.3 (10th Cir. 2003). The Rehabilitation Act defines "individual with a disability" (for purposes of § 794) as "any person who: (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities; (ii) has a record of such an impairment; or (iii) is regarded as having such an impairment." 29 U.S.C. § 705(20)(B); 42 U.S.C. § 12102(1). Knowles is certainly a disabled individual under the

Rehabilitation Act.  He appears "qualified" under the ADA as well: Knowles has severe, long-term disabilities, is Medicaid-eligible, risks placement in an medical institution, and home care is appropriate and beneficial according to his doctors.

Under Title II of the ADA, "unjustified institutional isolation of persons with disabilities is a form of discrimination." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600 (1999); *see* 29 U.S.C. § 794(a).  A state's refusal to provide home healthcare services when a disabled individual would require similar care in an institution may constitute discrimination.  *Radaszewski*, 383 F.3d at 613–14.  To avoid discrimination, placement in community settings may be required when a "State's treatment professionals have determined that community placement is appropriate, the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities."  *Olmstead*, 527 U.S. at 587.  A state's "responsibility, once it provides community-based treatment to qualified persons with disabilities, is not boundless," however, a state may resist modifications that entail a fundamental alteration of its services and programs.  *Id.* at 603 (citing 28 C.F.R. § 35.130(b)(7)).

While the State's treatment professionals determined that Plaintiff's needs "can be served in an institutionalized setting," Plaintiff's own treating professionals insist that a community—not an institutional—setting is the only setting in which Plaintiff can

survive. Defendants argue that care in a state institution would meet Plaintiff's needs. But, one facility to which Defendants referred Plaintiff for possible care, unequivocally stated that neither it, nor any other nursing facility, could meet Plaintiff's many complex medical needs. While a representative of a second facility, Denton State School, expressed a contrary view, the Denton State School is rated 20 out of 100 on Defendants' own websites and threatened with decertification based on, among other things, failure to "provide clients' health care services" and to "secure nursing services as identified by the clients' needs." As this Court previously noted, these are not reassuring signs for a father faced with the prospect of sending his son to a facility. Furthermore, the Department of Justice in the DOJ Report has pointed to the numerous fatalities of residents at state facilities.  (Pl.'s App. 254–56).  Many of these deaths resulted from aspiration, precisely the catastrophic event that Plaintiff's treating physicians and designated expert warn will certainly occur if Plaintiff is placed in an institutional setting.

Next, there is no dispute that Plaintiff wants to be in the community setting. Plaintiff has demonstrated, and there is no evidence to the contrary, that Knowles wishes to be in the community setting.

Finally, community-based services can be reasonably accommodated taking into account the resources of the State and the needs of others with comparable disabilities. Defendants have provided Medicaid services to Plaintiff in his home since he was born.

Plaintiff only seeks a continuation of these services not a fundamental alteration. Additionally, since the preliminary injunction order, the cost to Defendants to provide Plaintiff care is now approximately half of what it was when this Court granted Plaintiff injunctive relief in January 2009.  Moreover, Plaintiff's suggest if Defendants have Cost Cap concerns, they can apply to the United States Secretary of Health and Human Services to amend the current Cost Cap. *See Grooms v. Maram*, 563 F. Supp. 2d 840, 857 (N.D. Ill. 2008) ("Illinois could act in cooperation with the federal government to achieve community-based integration which may otherwise be impeded by existing rules or requirements. . . . [T]he federal government has not denied a single waiver application in the last ten years.  Defendant here presents no basis to believe the federal government would deny the State's application for an amendment in this case and the court will not concoct one.") (citations omitted).

Furthermore, state general revenue funds became available on September 1, 2007, through Rider 45, a legislative enactment designed precisely to provide care in the home to individuals such as Knowles. In making its determination that it would not use such funds to provide Knowles with services in the home, DADS offered the conclusion that an institution could provide the necessary services to Knowles.  But this assertion does not line up with the summary judgment evidence.  There is no evidence that an institution can adequately meet the high demand of providing round-the-clock monitoring of Knowles, much less at a lower cost.

- 10 -

Whereas Plaintiff, on the other hand, has proven that the care he requires would be similar whether at home or in an institution.  Plaintiff has provided credible evidence from his caregiving physicians and designated expert that the state has no institutional way to provide the necessary life-sustaining care at less cost than he is currently provided at home.  Thus, the Court finds the State's plan would cause an unjustified institutional isolation of Knowles, which would result in an ADA violation.  *Radaszewski*, 383 F.3d at 607.

## 2.    Due Process and State Law Claims

Corresponding Texas state law seeks to preserve and promote the rights of individuals with mental retardation to live at home.  Persons with Mental Retardation Act (the "PMRA"), Tex. Health & Safety Code §§ 591.002(d) , 592.013(3).  The PMRA expressly contemplates an individual's right to receive needed services in an environment that is "the least confining for a client's condition . . . and provided in the least intrusive manner reasonably and humanely appropriate to the person's needs."  *Id.* §§ 591.005(1)–(2), 592.032.  Texas courts have held that the PMRA "unquestionably [gives] mentally retarded persons the . . . statutory right to a least restrictive environment commensurate with their needs and abilities."  *Carter v. Texas*, 611 S.W.2d 165, 166 (Tex. Civ. App.—Austin 1981, writ ref'd n.r.e.).  Moreover, it appears the PMRA seeks to conform itself to the dictates of relevant federal law.  *See, e.g.*, Tex. Health & Safety Code § 592.011 ("Each person with mental retardation in this state has

- 11 -

the rights, benefits, and privileges guaranteed by the constitution and laws of the United States and this state."). Thus, for the same reasons as Defendants' conduct with respect to Plaintiff constitutes impermissible discrimination under the ADA and Section 504, it violates the PMRA as well. There is no genuine issue of material fact as to this point, and Plaintiff is entitled to judgment as a matter of law on his PMRA claims.

Moreover, Defendants decided not to use state general revenue funds under Rider 45 for Plaintiff's treatment and did not provide Plaintiff an opportunity for review. If DADS denies or reduces Medicaid-funded services to an eligible individual, it must provide a fair hearing to that individual. 42 U.S.C. § 1396a(a)(3); *e.g., Jonathan C. v. Hawkins*, No. 9:05-CV-43, 2006 U.S. Dist. LEXIS 87792, at *20-21 (E.D. Tex. Dec. 5, 2006); 1 Tex. Admin. Code § 357.1. The HCS program is included within the scope of this mandate. 40 Tex. Admin. Code § 9.169 ("An individual whose request for eligibility for the HCS Program is denied or is not acted upon with reasonable promptness, or whose services have been terminated, suspended, or reduced by DADS is entitled to a fair hearing in accordance with Subchapter G of this chapter (relating to Medicaid Fair Hearings)").

Defendants argue that Plaintiff was provided a fair hearing in August 2007 with respect to Medicaid-funded services. But, the August 2007 hearing officer based his decision to allow the termination of Plaintiff's HCS services because the cost of those services would exceed the Cost Cap in place at that time. His decision excluded

- 12 -

consideration of Rider 45 funds.  Since that time, Rider 45 increased the Cost Cap and added an additional source of funding to supplement HCS funds. This additional source of funding through state general revenue is inextricably intertwined with the underlying Medicaid funds.  The standards Defendants used to evaluate whether or not to deny state general revenue funds under Rider 45 therefore effectively governed whether Knowles would receive HCS funds as well.  Because the determinations made with respect to the various funding sources are inseparable, the Medicaid fair hearing requirements apply to Rider 45 state general revenue funds.

Defendants' failure to accord Plaintiff a fair hearing and the opportunity to appeal violates the due process provisions of both the United States and Texas Constitutions. Under the United States Constitution, no state may take any action which would "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  Similarly, under the Texas Constitution, "[n]o citizen of [the] State shall be deprived of life, liberty, [or] property . . . except by the due course of the law of the land."  Tex. Const. art. I, § 19.  The due process clause of the Texas Constitution is generally interpreted in the same manner as its federal counterpart.  *See Pena v. Texas*, 226 S.W.3d 634, 638 (Tex. App.—Waco 2007) *rev'd on other grounds*, 285 S.W.3d 459 (Tex. Crim. App. 2009) ("Provisions of the Texas Constitution which have analogues in the federal constitution are generally interpreted to have the same meaning").

Application for Medicaid benefits, even before eligibility has been determined,

qualifies as a constitutionally protected property interest.  *See Hamby v. Neel*, 368 F.3d 549, 559 (6th Cir. 2004) ("[T]his Court has previously held that a social security claimant has a property interest in benefits for which he or she hopes to qualify.  Since Medicaid is a program established by Title XIX of the Social Security Act, 42 U.S.C. § 1396, *et seq.*, we find that Plaintiffs likewise have a property interest in the [Medicaid] coverage for which they hope to qualify.") (citation omitted).  Plaintiff has a due process right to a fair hearing and associated appeal regarding Defendants' termination of his services.  Plaintiff was not provided a fair hearing and appeal.  Consequently, Defendants violated 42 U.S.C. § 1983, which provides that "[e]very person who . . . subjects . . . any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."  Because Defendants failed to provide Plaintiff a fair hearing by considering the Rider 45 funds, there is no genuine issue of material fact that Plaintiff's due process rights were violated.  Thus, Plaintiff is entitled to judgment as a matter of law on his due process claims.

### B.    Irreparable Injury

Injury is irreparable if it cannot be undone through monetary remedies.  *Enterprise Int'l, Inc. v. Corp. Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985).  The absence of an available remedy by which the movants can later recover monetary damages, however, may also be sufficient to show irreparable injury.  *Id.* at 473.

- 14 -

Plaintiff has readily demonstrated that he faces a substantial threat of irreparable injury if an injunction is not granted. His treating physicians, Director of Nursing from one private nursing facility that looked into the possibility of caring for Plaintiff, and Plaintiff's designated expert, assert that he will die if institutionalized. No harm could be more irreparable, and no remedy at law can adequately address the harm he faces.

Defendants offer the affidavit of Dr. Fred Bibus in response. Dr. Bibus, medical director of the Austin State School and a DADS employee, asserts that the state system can adequately protect Plaintiff's health. Dr. Bibus, after visiting Knowles in his home and interviewing his caregivers, concluded that his medical needs are "easily consistent with the type of patient routinely and successfully served at the Austin State School."

Documentation provided by Plaintiff, however, shows that Dr. Bibus spent about one hour with Plaintiff before reaching a conclusion contrary to that of his treating physicians. Further, a DADS evaluation mistakenly lists the wrong name of the patient in some relevant portions, demonstrating the use of boilerplate language in the evaluation. The Court finds the considered, sworn opinions of Plaintiff's treating physicians developed over years of care carry more weight on this issue than a relatively cursory evaluation by state officials. Plaintiff has carried his burden and demonstrated a very substantial threat of irreparable injury.

## C.    Balance of Harms and the Public Interest

Plaintiff complains of irreversible damage and possible death if he is

institutionalized.  The state Defendants, however, assert that the cost of continued in-home care would deprive other patients of the care they require.

According to the affidavit of Gary Jessee, the assistant commissioner for the Access and Intake Division of DADS, the agency identified four state schools that it believed could care for Knowles.  As a result, Fred Knowles spoke directly with staff from the Denton State School, but did not believe the school could provide the necessary care.  Texas state schools are the subject of an investigation by the U.S. Department of Justice for potential civil rights violations due to alleged substandard care.  As stated earlier, DADS' own evaluation scored the Denton State School a "20" out of "100" based on a variety of criteria and DADS cited the facility for failing in critical care-giving categories.  (Pl.'s App. 232–36).

On the other hand, Fred Knowles has—with the assistance of dedicated medical professionals and support from the state of Texas—more than adequately cared for his son.  Defendants assert that the cost difference between in-home care and institutional care for Plaintiff equates to twenty-three other patients who would be prevented from participating in waiver services.  There is no indication, however, that these hypothetical patients face a likelihood of death.  Thus, despite Defendants' legitimate concerns over fiscal restraint, the balance of harms tilts decidedly toward Plaintiff.

Because the Defendants are state officials, determining the public's interest in this case requires similar analysis to the balance of harms.  State officials must contend with

limited budgets and exercise fiscal restraint.  Yet in passing Rider 45, the Texas legislature recognized the public's interest in maintaining home-based medical services for disabled citizens when appropriate.  The public interest cannot be measured solely in financial increments and must account for the dignity of life and the preservation of families.  It is notable that DADS and HHSC have provided such care to Plaintiff in his home since birth.   Plaintiff's treating physicians—including a neurologist, a pulmonologist, and his primary care physician for the past six years—state unequivocally that the care and support Plaintiff receives at home from his family provide stability, stimulation, and attention he could not get in a state facility.  Granting a permanent injunction only preserves the status quo as it has existed for decades now. The Court does not minimize the roles of DADS and HHSC as stewards of the public interest and the state treasury.  It is apparent, however, that simply maintaining the same level of care Plaintiff has received for twenty-six years will not disserve the public interest as conceived by the Texas Legislature.  Thus, the Court finds Plaintiff has satisfied the requirements necessary to obtain a permanent injunction.

## IV.    Conclusion

Based on the foregoing, Plaintiff's Motion for Summary Judgment is **GRANTED**. All other outstanding motions **DENIED**.

It is therefore **ORDERED** that Defendant Adelaide Horn, commissioner of the Texas Department of Aging and Disability Services, and Defendant Albert Hawkins,

executive commissioner of the Texas Health and Human Services Commission, and their officers, agents, servants, employees, representatives, attorneys, successors and assigns, and all other persons in active concert or participation with said Defendants, be hereby permanently enjoined and restrained from terminating the life-sustaining nursing services provided to Ryan Knowles through the Home and Community-based Services Medicaid waiver program.

**IT IS FURTHER ORDERED** that the Court shall continue to retain jurisdiction of this case for the purpose of enforcing this Order and all previous Orders of this Court.

**SO ORDERED**.

Signed February 10th, 2010.

_Ed Kinkeade_

ED KINKEADE

UNITED STATES DISTRICT JUDGE